Stephen M. Doniger, Esq. (SBN 179314)
stephen@donigerlawfirm.com
Scott A. Burroughs, Esq. (SBN 235718)
scott@donigerlawfirm.com
Regina Y. Yeh, Esq. (SBN 266019)
regina@donigerlawfirm.com
DONIGER / BURROUGHS APC
300 Corporate Pointe, Suite 355
Culver City, California 90230
Telephone: (310) 590-1820
Facsimile:  (310) 417-3538

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BUCKLEY H. CRISPIN, an Individual, <br><br> Plaintiff, <br><br> vs. <br><br> CHRISTIAN AUDIGIER, INC., a California Corporation; et al; <br><br> Defendants. | Case No.: CV09-9509 MMM (JEMx) <br> *The Honorable Margaret M. Morrow Presiding* <br><br> **PLAINTIFF BUCKLEY H. CRISPIN'S NOTICE OF MOTION AND MOTION FOR REVIEW OF MAGISTRATE JUDGE'S MARCH 30, 2010 ORDER; DECLARATION OF REGINA Y. YEH, ESQ. IN SUPPORT THEREOF** <br><br> Date: May 10, 2010 <br> Time: 10:00 a.m. <br> Court: 780 <br><br> [PROPOSED ORDER SUBMITTED HEREWITH] |

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on May 10, 2010, at 10:00 a.m. in Courtroom 780 of the above-referenced court, located 255 East Temple Street, Los Angeles, California 90012, Plaintiff Buckley H. Crispin ("Plaintiff" or "Crispin") will and hereby does move the Court for Review of the Magistrate Judge's March 30, 2010

Order denying in part, granting in part and limiting the scope of some of the requests to Crispin's Motion to Quash Subpoenas *Duces Tecum.*

The March 30, 2010 Order, issued before Crispin had its full opportunity to provide his Supplemental Memorandum to the Joint Stipulation as allowed under C.D. Cal. R. 37-2.3, denied in part Crispin's Motion to Quash the Subpoenas addressed to Media Temple, Inc., Facebook, and MySpace, Inc., based in part on Crispin's alleged failure to refute Defendants' allegations, and in part on clear errors of law. Specifically, the expansive disclosure ultimately ordered by the Magistrate Judge compels disclosure of information that is protected by the Stored Communications Act, as interpreted by the Ninth Circuit.  Because the Order depends on conclusions that are clearly erroneous and contrary to Ninth Circuit law, it should be modified or set aside.

This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the declaration of Regina Y. Yeh, the pleadings and papers on file herein, and such oral argument as may be presented at a hearing on this motion.

This application is made following the conference of counsel pursuant to Local Rule 7-3, which took place on April 7, 2010.


Dated: April 9, 2010                              Respectfully submitted,

                                                  DONIGER / BURROUGHS APC


                                       By:   /S/ Regina Y. Yeh
                                             Regina Y. Yeh, Esq.
                                             Attorney for Plaintiff

PLAINTIFF'S MOTION FOR REVIEW OF MAGISTRATE JUDGE'S ORDER

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................. 1

II.    FACTUAL AND PROCEDURAL BACKGROUND ......................................... 1

III.   STANDARD OF REVIEW .......................................................................... 2

IV.    ARGUMENT .......................................................................................... 3

  A.     Background of the Stored Communications Act ............................................... 4

  B.     The March 30 Order Requires Disclosure of Electronic Communications Protected by the Stored Communications Act ............................................................ 9

    1.     The Magistrate's Definition of an ECS is Clearly Erroneous. ......................... 9

      a.     *The SCA and the Ninth Circuit Counsels a Broad Definition of an "ECS" Provider.* ............................................................................................. 9

      b.     *The SCA does not Require that an Entity Provide Internet Access in order to Qualify as an ECS.* ............................................................................... 10

      c.     *The March 30 Order Erroneously Equates "Service Providers" with "Online Merchants."* ........................................................................... 11

    2.     Facebook, Myspace and Media Temple are Indisputably "Electronic Communication Service" Providers. ...................................................... 12

      a.     *Social Networking Websites like Facebook and MySpace are ECS Providers.* ...................................................................................... 12

      b.     *Webhosting Services like Media Temple Qualifies are ECS Providers.* ...... 14

  C.     A Civil Subpoena is Insufficient to Override the Protections of the SCA. ..... 15

  D.     The Electronic Communications Sought are Unequivocally in "Electronic Storage" ............................................................................................... 19

    1.     Definition of "Electronic Storage" ...................................................... 19

    2.     *Materials Sought are Undeniably "Electronic Storage."* ........................... 22

      a.     Electronic Communications to Media Temple ....................................... 22

      b.     Electronic Communications sought from Facebook and MySpace .......... 22

V.     CONCLUSION ...................................................................................... 26

PLAINTIFF'S MOTION FOR REVIEW OF MAGISTRATE JUDGE'S ORDER

# TABLE OF AUTHORITIES

**Cases**

17 U.S.C. § 2702 *et seq.* ................................................................................ 3

18 U.S.C. § 2510(12) ...................................................................................... 9

*Adolph Coors Co. v. Wallace*, 570 F. Supp. 202, 205 (N.D. Cal. 1983) ....................... 3

*Bhan v. NME Hospitals, Inc.*, 929 F.2d 1404, 1414 (9th Cir. 1991) ............................. 2

*Facebook, Inc. v. Jeremi Fischer*, 2009 WL 5095269 at *1 (N.D. Cal. 2009) ............ 14

*Federal Trade Commission v. Netscape Communication Corp.,* FTC. 196 F.R.D. 559, 559, 561 (N.D. Cal. 2000) ....................................................................... 17

*Fraser v. Nationwide Mut. Ins. Co.*, 135 F. Supp. 2d 623, 635-38 (E.D. Pa. 2001) ...... 6

*In re DoubleClick, Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 511 n. 20 (S.D.N.Y. 2004) ............................................................................................... 10

*In re Subpoena Duces Tecum to AOL, LLC*, 550 F. Supp. 2d 606, 610 (E.D. Va. 2008) ................................................................................................. 17

*Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868 (9th Cir. Cal. 2002) .................... 6, 24

*Medical Imaging Ctrs. of Am., Inc. v. Lichtenstein*, 917 F. Supp. 717, 719 (S.D. Cal. 1996). .................................................................................................. 3

*MySpace, Inc. v. The Globe.com, Inc.*, 2007 WL 1686966 at *1 (C.D. Cal. 2007) ..... 14

*MySpace, Inc. v. Wallace*, 498 F.Supp.2d 1293, 1297 (C.D. Cal 2007) ..................... 13

*O'Grady v. Superior Court,* 139 Cal. App. 4th 1423 (Cal. Ct. App. 2006) ............... 17

*Quon v. Arch Wireless Operating Co., Inc.*, 529 F.3d 892, 900 (9th Cir. Cal. 2008) .. 8, 10, 21

*Theofel v. Farey-Jones*, 359 F.3d 1066, 1076-77 (9th Cir. 2004) ................. 7, 8, 16, 19

*U.S. v. Mullins*, 992 F.2d 1472, 1478 (9th Cir. 1993) ....................................... 12

**Statutes**

18 U.S.C. § 2510 (17) ................................................................................... 19

18 U.S.C. § 2510(14) .................................................................................... 6

PLAINTIFF'S MOTION FOR REVIEW OF MAGISTRATE JUDGE'S ORDER

18 U.S.C. § 2510(15) ................................................................ 5, 9

18 U.S.C. § 2510(17)(A) ................................................................ 5

18 U.S.C. § 2702 ................................................................ 2, 4

18 U.S.C. § 2711(2) ................................................................ 6

18 U.S.C. §§ 2510(12) ................................................................ 9, 12

28 U.S.C. § 636(b)(1)(A) ................................................................ 2

**Other Authorities**

Josh Lowensohn, *Newbie's Guide to Facebook*, CNET NEWS, *available at*
   http://news.cnet.com/newbies-guide-to-facebook/ (last visited Apr. 8, 2010) ......... 13

Josh Lowensohn, *Newbie's Guide to Facebook*, CNET NEWS, *available at*
   http://news.cnet.com/newbies-guide-to-facebook/ (last visited Apr. 8, 2010). ........ 23

Media Temple, Inc., home page, http://mediatemple.net/company/about.php (last
   visited April 9, 2010) ................................................................ 15

Orin S. Kerr, *A User's Guide to the Stored Communications Act, and a Legislator's
   Guide to Amending It*, 72 GEO. WASH. L. REV. 1208, 1209-13 (2004) .............. 4, 6

S. Rep. No. 99-541 at 1-2 (1986), *reprinted at* 1986 U.S.C.C.A.N. 3555, 3555-57 . 5, 6

S. Rep. No. 99-541, at 16 (1986) ................................................................ 20

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Plaintiff Buckley H. Crispin ("Plaintiff" and "Crispin") respectfully seeks review of Magistrate Judge McDermott's March 30, 2010 Order denying in part Crispin's Motion to Quash Defendants Christian Audigier, Christian Audigier, Inc., Nervous Tattoo, Inc., and Shop on Stage, Inc.'s (collectively, "Defendants") subpoenas *duces tecum* to Media Temple, Inc., Facebook, and MySpace, Inc. ("the March 30 Order").  (*See* Dkt. No. 41.)  That Order effectively required the production of electronic communications from Media Temple, Inc., Facebook, and MySpace, Inc despite the fact that said information is protected by the Stored Communications Act ("SCA").   As such, Plaintiff's motion to quash should have been granted and this Court should modify that Order accordingly.

To be clear, Crispin does not object to the Magistrate Judge's March 30 Order to the extent it requires production of Crispin's basic subscriber information as to Facebook and MySpace, Inc.  Crispin objects, however, that it seeks to compel these service providers to divulge electronic communications that they are expressly prohibited from disclosing under 18 U.S.C. § 2702(a)(1).

### II.    FACTUAL AND PROCEDURAL BACKGROUND

On December 29, 2009, Plaintiff Buckley H. Crispin, a graphic artist, filed a complaint against Christian Audigier, Inc., and its sublicensees for breach of contract and copyright infringement regarding the use of several pieces of artwork that Crispin provided to Defendants.[1]

On February 10, 2010, Defendants served Rule 45 Subpoenas *Duces Tecum* on four third-party business and social networking websites: Black Market Art Company, Facebook, Media Temple, Inc., and MySpace, Inc.  These subpoenas sought, *inter*

*alia,* electronic communications to and from Crispin.  Because the production of these protected documents was to be within a matter of days, Crispin filed an Ex Parte Motion to Stay Compliance with the Subpoenas on February 24, 2010.

After the parties met and conferred on the subpoena requests, on March 4, 2010, the Magistrate Judge held a telephonic hearing, where the parties agreed to suspend compliance with the subpoenas until a ruling on a Motion to Quash.  On March 17, 2010, Crispin filed a joint stipulation with Defendants for a Motion to Quash these Subpoenas.

On March 30, 2010, the District Court denied in part, granted in part, and limited the scope of some of the requests within the subpoenas.  In so holding, the court found, *inter alia,* the following: (1) Crispin failed to establish that Facebook, MySpace, Inc., and Media Temple, Inc. constituted "electronic communications services" as defined under the Stored Communications Act, 18 U.S.C. § 2702 *et seq.*; (2) even if those entities qualified as ECS's, a civil subpoena was sufficient to compel disclosure; and (3) the communications that the subpoenas sought were not held in "electronic storage," as defined under the statute.

On April 7, 2010, Plaintiff met and conferred with Defendants' counsel, who agreed to maintain the current stay on compliance with the subpoenas until a ruling on this Motion.

### III.   STANDARD OF REVIEW

Pursuant to Rule 72(a) of the Federal Rules of Civil Procedure, on timely motion, the District Judge must modify or set aside any order of a Magistrate Judge on non-dispositive pretrial matters that is "clearly erroneous" or "contrary to law." *See also* 28 U.S.C. § 636(b)(1)(A); *Bhan v. NME Hospitals, Inc.*, 929 F.2d 1404, 1414 (9th Cir. 1991).  Where the Magistrate Judge has determined issues of fact, the

---

[1] Crispin filed a First Amended Complaint on April 2, 2010.

PLAINTIFF'S MOTION FOR REVIEW OF MAGISTRATE JUDGE'S ORDER

District Judge reviews such findings for clear error.  *Adolph Coors Co. v. Wallace*, 570 F. Supp. 202, 205 (N.D. Cal. 1983).  However, the District Judge reviews issues of law or mixed questions of fact and law *de novo.  Medical Imaging Ctrs. of Am., Inc. v. Lichtenstein*, 917 F. Supp. 717, 719 (S.D. Cal. 1996).

## IV.   ARGUMENT

The March 30 Order was erroneous and must be reversed for three primary reasons.  First, the Order is premised on the basis that Media Temple, Inc., Facebook, and MySpace, Inc., do not constitute "electronic communications service" ("ECS") providers, as defined under the Stored Communications Act ("SCA"), 17 U.S.C. § 2702 *et seq.*[2]  This finding is clearly erroneous, and the March 30 Order that those three entities be compelled to produce documents pursuant to the subpoena is contrary to law.  Second, the Order states that ***even if*** those entities were considered ECS providers, Defendants' subpoenas would be enough to lawfully compel disclosure of those protected communications.  This is also contrary to law, as courts have held that a civil subpoena is not sufficient to bypass the protections of the ECPA.  Finally, the Order provides that the electronic communications that the subpoenas seek are not in "electronic storage," as defined by the statute.  This conclusion is also contrary to law.

By this Motion, Crispin requests that the Court take note of the background and policy reasons for the SCA, as well as the three separate grounds of the March 30 Order to which Crispin objects, and modify or set aside the March 30 Order, as consistent with the arguments herein.

---

[2] The Stored Communications Act (SCA) was passed by the United States Congress in 1986 as part of the Electronic Communications Privacy Act, and is codified at 18 U.S.C. §§ 2701 to 2712. The SCA addresses voluntary and compelled disclosure of "stored wire and electronic communications and transactional records" held by third-party electronic communications services.

## A.   Background of the Stored Communications Act

The privacy of stored Internet communications in the United States is governed by the federal statute known as the Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701–2711 (2000), which was first enacted in 1986.[3]  The SCA was enacted because the advent of the Internet presented a host of potential privacy breaches that the Fourth Amendment does not address.[4]

Generally, the SCA prevents "providers" of communications services from divulging private communications to certain entities and/or individuals.  Orin S. Kerr, *A User's Guide to the Stored Communications Act, and a Legislator's Guide to Amending It*, 72 GEO. WASH. L. REV. 1208, 1209-13 (2004).  It does this in two ways: the statute limits on the government's ability to compel providers to disclose information in their possession about their customers and subscribers, and second, the statute limits the ability of those providers to voluntarily disclose information about their customers and subscribers to the government.  Kerr at 1212-13.

The crux of the SCA, however, is that it applies to only two categories of network service providers, and depending on whether or not a service falls into the scope of these categories – and then, which category it falls into – different limitations apply.[5]  *Id.* at 1213.  The reasoning behind the SCA's classifications reflects the technology of the 1980s.  Consequently, by adopting the distinctions, the SCA has *frozen into law the understandings of computer network use as of 1986*.  *Id.* at 1214.

---

[3] The SCA was enacted as part of the Electronic Communications Privacy Act of 1986, Pub. L. No. 99-508, 100 Stat. 1848 (codified as amended in scattered sections of 18 U.S.C.).

[4] *See* S. Rep. 99-541, 1986 U.S.C.C.A.N. 3555[4]; *Quon v. Arch Wireless Operating Co., Inc.*, 529 F.3d 892, 900 (9th Cir. 2008); *see also* Orin S. Kerr, *A User's Guide to the Stored Communications Act, and a Legislator's Guide to Amending It*, 72 GEO. WASH. L. REV. 1208, 1209-13 (2004).

[5] "The statute creates rights held by 'customers' and 'subscribers' of network service providers in both content and noncontent information held by two particular types of providers."  Orin S. Kerr, *A User's Guide to the Stored Communications Act, and a Legislator's Guide to Amending It*, 72 GEO. WASH. L. REV. 1208, 1213 (2004).

4

The 1986 Senate Report on the SCA explains that computer network account holders at that time generally used third-party network service providers in two ways. First, users used their accounts to send and receive communications such as e-mail. This prompted privacy concerns because at the time, computers often copied messages and stored them temporarily pending delivery (i.e., the services created copies of the messages and placed them in temporary "electronic storage" in the course of transmission, which sometimes stayed on a provider's computer for months). *Id.* at 1213; *see also* S. Rep. No. 99-541 at 1-2 (1986), *reprinted at* 1986 U.S.C.C.A.N. 3555, 3555-57[6]; *United States v. Miller,* 425 U.S. 453 (1976) (holding that customer had no standing to contest disclosure of his bank records).  Second, users used network service providers to outsource computer tasks.  For example, users paid remote computers to store extra files or process large amounts of data.[7]

The SCA therefore sought to regulate the above services by specifying the following two types of providers: (1) "electronic communications service" ("ECS") providers, and (2) "remote computing service" ("RCS") providers.  The statute defines ECS as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).[8]  It defines "electronic storage" as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof," 18 U.S.C. § 2510(17)(A), *and* "any

---

[6] S. Rep. No. 99-541 at 1-2 (1986), *reprinted at* 1986 U.S.C.C.A.N. 3555, 3555-57:
> These services as well as the providers of electronic mail create electronic copies of private correspondence for later reference. This information is processed for the benefit of the user but often it is maintained for approximately 3 months to ensure system integrity. For the person or business whose records are involved, the privacy or proprietary interest in that information should not change.

[7] The 1986 Senate Report provides: "[f]or example, physicians and hospitals maintain medical files in offsite data banks, businesses of all sizes transmit their records to remote computers to obtain sophisticated data processing services."  S. Rep. No. 99-541 at 2 (1986), *reprinted at* 1986 U.S.C.C.A.N. 3555, 3557.

[8] The Senate Report on the ECPA in 2000 provides as examples that "telephone companies and electronic mail companies" generally act as providers of electronic communication services. See S. Rep. No. 99-541, at 14, reprinted in 1986 U.S.C.C.A.N. at 3568.

storage of such communication…for purposes of backup protection of such communication."  *Id.* at § 2510(17)(B).[9]  On the other hand, an RCS is defined as "the provision to the public of computer storage or processing services by means of an electronic communications system."  18 U.S.C. § 2711(2).  An "electronic communications system" is in turn defined as "any wire, radio, electromagnetic, photooptical or photoelectronic facilities for the transmission of electronic communications, and any computer facilities or related electronic equipment for the electronic storage of such communications."  18 U.S.C. § 2510(14).  (For the purposes of this Motion, the following discussion is limited to ECS providers only.)

This statutory framework, while designed to "address…access to stored wire and electronic communications and transactional records," S. Rep. No. 99-541 at 3 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555, 3557, has nevertheless been difficult to apply, especially as the SCA was written prior to the advent of the Internet and the World Wide Web.  *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868 (9th Cir. Cal. 2002).  For example, today, most network service providers are multifunctional, and could technically qualify as both ECS and RCS providers, or depending on their functions, would qualify as neither.  Kerr at 1215-16.  Another practical example is that many e-mail providers today allow a user to keep e-mails indefinitely, which has led to diverging case law on whether those e-mails are in "incidental storage" or "backup storage" with respect to the traditional (meaning, in the context of 1986) understanding of those terms.  See, e.g., *Fraser v. Nationwide Mut. Ins. Co.*, 135 F. Supp. 2d 623, 635-38 (E.D. Pa. 2001) (concluding that e-mails taken from post-transmission storage are not in "electronic storage"), *aff'd on other grounds*, 352 F.3d 107 (3d Cir. 2003); H.R. Rep. No. 99-647, at 64-65 (1986) (noting that opened e-mail

---

[9] The SCA prohibits an ECS from "knowingly divulg[ing] to any person or entity the contents of a communication while in electronic storage by that service," unless, among other exceptions not relevant to this Motion, that person or entity is "an addressee or intended recipient of such communication." I8 U.S.C. § 2702(a)(1), (b)(1), (b)(3).

stored on a server are protected under provisions relating to remote computing services); *Theofel v. Farey-Jones*, 359 F.3d 1066, 1076-77 (9th Cir. 2004) ("We think that prior access is irrelevant to whether the messages at issue are in electronic storage.").[10]

Of course, the Ninth Circuit's decision is *Theofel* specifically rejected the view that opened emails are not in electronic storage, stating: "We reject this view as contrary to the plain language of the [SCA]." *Theofel,* 359 F.3d at 1075.  In *Theofel v. Farey-Jones,* the Ninth Circuit stated the policy rationale for the SCA:

> The Act reflects Congress's judgment that users have a legitimate interest in the confidentiality of communications in electronic storage at a communications facility. Just as trespass protects those who rent space from a commercial storage facility to hold sensitive documents, cf. Prosser and Keeton on the Law of Torts § 13, at 78 (W. Page Keeton ed., 5th ed. 1984), the Act protects users whose electronic communications are in electronic storage with an ISP or other electronic communications facility.

*Theofel*, 359 F.3d at 1072-1073.  Further, when the statute is clear and unambiguous, the Ninth Circuit has sought to apply the *plain language* construction of the SCA, including the "common-sense definitions" of statutory terms such as "electronic communications service" and "electronic storage," which again is supported by

---

[10] Further, the implications of this outdated statutory scheme has provoked numerous calls by privacy advocates, major Internet and communications service providers, and legal scholars alike to strengthen online privacy laws.  *See* Miguel Helft, Technology Coalition Seeks Stronger Privacy Laws*, N.Y.TIMES, *available at* http://www.nytimes.com/2010/03/31/technology/31privacy.html (last visited Apr. 8, 2010); ECPA Reform: Why Now?, DIGITAL DUE PROCESS, *available at* http://www.digitaldueprocess.com (last visited Apr. 8, 2010).  This is especially relevant with respect to the forms of communications technology not anticipated by the SCA, such as digital voice messages and text messages, the aforementioned indefinitely stored e-mails, instant messages, mobile Internet devices (capable of, *inter alia,* generating real-time user's location data), and significantly, social networking sites.
Nevertheless, in interpreting the SCA in the context of modern communications technology, the Ninth Circuit and other courts have sought to reflect the stated policy of the statute, affording protections to electronic communications from those found on "secure" websites to text messages.

legislative history.  *Quon v. Arch Wireless Operating Co., Inc.*, 529 F.3d 892, 900 (9th Cir. Cal. 2008); *see also Theofel,* 359 F.3d at 1072 (expressly rejecting the view that "backup protection" includes only temporary backup storage pending delivery, and not any form of post-transmission storage, and holding that view as contrary to the plain language of the Stored Communications Act, 18 U.S.C.S. § 2701 *et seq.*).  It is clear, then, that while diverging interpretations of the SCA exist, the approach set forth by the ***controlling authority of the Ninth Circuit*** governs the protections of electronic communications here.

In this case, the March 30 Order cannot stand because it allows subpoenas to Media Temple, Inc. ("Media Temple"), Facebook, and MySpace, Inc. ("MySpace") to stand in violation of the SCA.  As first described in Plaintiff and Defendants' Joint Stipulation to Plaintiff's Motion to Quash, Media Temple is a company which provides web hosting services, e-mail account services, and other website content features to Plaintiff Buckley H. Crispin ("Plaintiff" or "Crispin").  Facebook and MySpace are websites with social networking features, which allow Crispin to send and receive electronic communications, ***both*** through postings on user-created "profile pages," ***and*** through e-mail.  While the SCA may not have contemplated these exact forms of Internet technology, the communications sent and received through Media Temple, Facebook, and MySpace are ***exactly*** the types of communications that were contemplated for protection under the SCA and there is no question that the Ninth Circuit would so hold given its findings in *Konop, Theofel* and *Quon.*

In accordance with the plain meaning of the SCA, the stated policy therein, and the Ninth Circuit case law interpreting the statute, Crispin therefore respectfully requests that the Magistrate Judge's March 30 Order be modified or set aside.  As Crispin has an irrefutably legitimate interest in the privacy of his e-mail

---

*See, e.g., Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868 (9th Cir. Cal. 2002), *Quon v. Arch Wireless Operating Co., Inc.*, 529 F.3d 892 (9th Cir. Cal. 2008).

PLAINTIFF'S MOTION FOR REVIEW OF MAGISTRATE JUDGE'S ORDER

communications, the subpoena requests seeking those communications should be quashed.

**B.** **The March 30 Order Requires Disclosure of Electronic Communications Protected by the Stored Communications Act**

### 1. The March 30 Order's Definition of an ECS is Clearly Erroneous.

The March 30 Order misconstrues the definition of an Electronic Communication Service ("ECS") provider, contradicting both the SCA and interpretations of the SCA by the Ninth Circuit. As such, this Court should set aside or modify the Order.

#### a. *The SCA and the Ninth Circuit Counsels a Broad Definition of an "ECS" Provider.*

As set forth above, the SCA defines an "ECS" as "*any* service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15) (emphasis added). Additionally, the SCA defines "electronic communication" as "*any* transfer of signs, signals, writing, images, sounds, data or intelligence of *any nature* transmitted . . . by a wire, radio, electromagnetic, photoelectronic or photooptical system . . ." 18 U.S.C. § 2510(12) (emphasis added).

Clearly, the plain language of the SCA calls for a broad definition of an ECS. It follows that, under the SCA, an ECS provider is an entity that allows users to send or receive *any* information electronically. *See* 18 U.S.C. §§ 2510(12), 2510 (15).

This broad definition of an ECS was also expressly adopted by the Ninth Circuit in *Quon v. Arch Wireless Operating Co., Inc.* In its discussion of whether Arch Wireless constituted an ECS provider, the Ninth Circuit turned to the "plain language of the SCA, including its common-sense definitions . . . ." *Quon*, 529 F.3d at 901. The Ninth Circuit ultimately found that Arch Wireless was an ECS simply because it was a "service," and because it provided users the ability to send or receive

9

electronic communications in the form of text messages.  *See id.* (citing 18 U.S.C. §
2510(15)).

Despite the SCA's broad definition of any ECS, as well as the Ninth Circuit's
"common-sense" interpretation of the "plain language" of the SCA, the March 30
Order provides several narrow and contradictory definitions of what an ECS is.

For example, the Order first defines an ECS as an entity that "serve[s] as a
conduit for the transmission of electronic communications . . . and ***store[s] those
communications as a backup for the user*** . . . ." (Ord. Mtn. Quash 7) (emphasis
added).  Although the Magistrate Judge cited *Quon* for this definition, this is a clear
misreading of the *Quon* case.  In *Quon*, the Ninth Circuit did not require that an entity
provide backup storage of electronic communications to constitute an ECS.  *See
Quon*, 529 F.3d at 901 (the Ninth Circuit adhered to the SCA's broad definition of an
ECS under 18 U.S.C. § 2510(15)).  Rather, the Ninth Circuit was addressing whether
the Defendant ECS held electronic communications in "electronic storage," an issue
that is ***separate and apart*** from the definition of an ECS.  *See id.* at 902 (holding that
Arch Wireless was an ECS that *additionally* retained electronic communications in
electronic storage).

### b.  *The SCA does not Require that an Entity Provide Internet Access in order to Qualify as an ECS.*

Additionally, the March 30 Order incorrectly implies that an entity must
provide "Internet access" to constitute an ECS.  (Ord. Mt. Quash 8.)  This requirement
has absolutely no basis under the SCA's statutory definition of an ECS, nor does it
exist under the Ninth Circuit's interpretation of this definition.

The March 30 Order correctly noted that Internet service providers ("ISP"),
***among other entities***, may constitute ECS providers. (Ord. Mot. Quash 7.)  In other
words, an ISP is merely ***one*** example of an ECS, and not the only type of entity that
may constitute an ECS.  *See, e.g.*, *In re DoubleClick, Inc. Privacy Litig.*, 154 F. Supp.
2d 497, 511 n. 20 (S.D.N.Y. 2004) ("***Examples*** of [ECS providers] in the Internet

10

world would *include* ISPs . . . .") (emphasis added).[11]  Despite this, the Order contradictorily holds that Facebook, MySpace and Media Temple are not ECS providers because they do not provide access to the internet.  (Order Mtn. Quash 8.)[12] As such, the Magistrate Judge's requirement that an entity provide Internet access in order to qualify as an ECS provider is clearly erroneous.

### c.  *The March 30 Order Erroneously Equates "Service Providers" with "Online Merchants."*

Next, the March 30 Order erroneously equates online service providers with online merchants, finding that "businesses providing products or services on or through the internet are not ECS providers."  (Ord. Mtn. Quash 7.)  While it cites several cases that hold that online merchants did not qualify as ECS providers under the SCA, these cases merely stand for the narrow proposition that online *retailers and merchants* do not constitute ECS providers – a holding which is inapplicable to the entities at issue in this present action.[13]

---

[11] The legislative history of the SCA, as well as the Ninth Circuit, supports this view of ECS providers.  In *Quon*, the Ninth Circuit quoted the legislative history of the SCA when it stated that ECS providers may include "large-scale electronic mail operations, computer-to-computer data transmissions, cellular and cordless telephones, paging devices, and video teleconferencing . . . [and] not just common carriers . . . ."  *Quon*, 529 F.3d at 901 (citing S. REP. NO. 99-541, at 2-3 (1986)).  An ECS provider is not limited to those few entities that provide internet access to users.

[12] This finding contradicts the legislative history of the SCA as well as the Ninth Circuit's interpretation of the SCA, which was expressly recognized by the Magistrate Judge earlier in the March 30 Order.  (Ord. Mtn. Quash 7.)

[13] One of the cases that the March 30 Order cites to in support of the assertion that entities providing "services on or through the internet are not ECS providers" is *Dyer v. Northwest Airlines Corp*.  In Dyer, the District Court addressed the issue of whether Northwest Airlines, an airline company, provided an electronic communications service through its website.  *Dyer v. Northwest Airlines Corp.*, 334 F. Supp. 2d 1196, 1198 (D.N.D. 2004).  The Court eventually held that Northwest was not an ECS based on the fact that it was a *business that sold traditional products over the internet*. Similarly, the other cases that the March 30 Order cites to in support of the incorrect assertion that businesses providing services over the internet do not constitute ECS providers dealt narrowly with *retailers and merchants* that sold *traditional goods* over the internet, rather than entities that provided electronic communication services such as e-mail services, webhosting, and social networking.  *See, e.g.*, *Crowley v. Cybersource Corp.*, 166 F. Supp. 2d 1263 (N.D. Cal. 2001) (Amazon.com did not constitute and ECS because it was an "*online merchant* that sells, *inter alia*, books, CDs, and personal electronics devices over the Internet.") (emphasis added).

11

Moreover, the Ninth Circuit has expressly recognized that an online merchant can be an ECS.  *See U.S. v. Mullins*, 992 F.2d 1472, 1478 (9th Cir. 1993) (stating that an airline, though a computerized travel reservation system accessed through terminals by travel agencies, constituted a provider of electronic communication services).  As will be discussed further below, the subpoenaed parties in this action are not online merchants or retailers offering traditional wares for sale on the internet.  As such, this line of cases cited in the March 30 Order is distinguishable and inapplicable to the subpoenaed parties in this action.

For these reasons, and the reasons set forth above, this Court should set aside or modify the March 30 order.

### 2.   Facebook, Myspace and Media Temple are Indisputably "Electronic Communication Service" Providers.

As set forth above, the SCA's definition of an ECS provider encompasses a broader range of entities than ones that merely provide Internet access.  Facebook, MySpace and Media Temple clearly fall within this definition of an ECS provider, under the SCA, and as interpreted by the Ninth Circuit.  As such, the relevant subpoena requests sent to these entities should be quashed.

### a.   *Social Networking Websites like Facebook and MySpace are ECS Providers.*

Social networking websites like Facebook and MySpace are unequivocally services that provide "to users thereof the ability to send or receive . . . electronic communications."  18 U.S.C. § 2510(15).

As noted above, to qualify as an ECS under the SCA, an entity must provide users the ability to communicate electronically with each other.  *Id.*  The crux of social networking websites like Facebook and Myspace is to allow its users the ability to *communicate electronically* with other users.  Two examples of electronic

communications services that both Facebook and MySpace offer to their respective

users are profile page messaging and private electronic mail messaging, which clearly

fit into the SCA's definition of "electronic communications."  Because Facebook and

MySpace both *provide* their users the ability to send and receive *electronic*

*communications*, they are ECS providers within the meaning of both the SCA, and

the Ninth Circuit's interpretation of the SCA.

Both Facebook and MySpace allow users to post and receive messages on their

profile pages.  Specifically, one of the features on Facebook is the "'wall,' which

allows a user to post messages, videos, links and photos on other users' profile pages.

Josh Lowensohn, *Newbie's Guide to Facebook*, CNET NEWS, *available at*

http://news.cnet.com/newbies-guide-to-facebook/ (last visited Apr. 8, 2010)

(Facebook allows users "a handful of ways to *communicate with others*.") (emphasis

added). Similarly, MySpace allows users to post comments on other users profile

pages.  *MySpace, Inc. v. Wallace*, 498 F.Supp.2d 1293, 1297 (C.D. Cal 2007)

(MySpace users "have the ability to *send and receive communications to and from*

*other MySpace.com users* . . . .") (emphasis added).

The finding of the March 30, 2010 Order that the posting of comments or

messages on Facebook and Myspace do not constitute sending or receiving electronic

communications (Ord. Mt. Quash 8.) therefore must be rejected.  As noted above, the

SCA defines "electronic communications" as *any transfer of signs, signals, writing,*

*images, sounds, data or intelligence of any nature* transmitted . . . by a wire, radio,

electromagnetic, photoelectronic or photooptical system . . . ."  18 U.S.C. § 2510(12)

(emphasis added).  This all-encompassing definition of "electronic communication"

unambiguously includes Facebook "wall" posts and MySpace "comments," which are

used as a means of *communication* between these social networking websites' users.

Even assuming, *arguendo*, that user messaging on profile pages does not

constitute the sending and receiving of electronic communications, Facebook and

MySpace also constitute ECS providers because they both provide users with an e-

mailing service.  Facebook "users may send messages to each other through the Facebook website, either by **e-mail** or by postings on a user's 'wall.'"  *Facebook, Inc. v. Jeremi Fischer*, 2009 WL 5095269 at *1 (N.D. Cal. 2009) (emphasis added).[14] Similarly, MySpace allows users to communicate electronically with one another through **private messaging**, which is almost identical to e-mail messaging.  *MySpace, Inc. v. The Globe.com, Inc.*, 2007 WL 1686966 at *1 (C.D. Cal. 2007) ("Members of MySpace have access to . . . the **MySpace.com Mail service**, where users can send and receive electronic mail messages . . . .") (emphasis added).

The March 30 Order expressly states that ECS providers include those entities that provide e-mail services (Ord. Mtn. Quash 7.), and even quotes Crispin's evidence that Facebook and MySpace allows "users to send and receive **messages, through posting on user-created 'profile pages' or through private messaging services**."  *Id.* However, it then inexplicably finds that Crispin has not proffered any evidence that Facebook and Myspace allow users to send or receive electronic communications.  *Id.* at 8.  In addition to being inherently contradictory, that finding ignores the Ninth Circuit-established principle that one of the purposes of the SCA was to protect e-mail messages.  *See Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 875 ("The legislative history of the ECPA suggests that Congress wanted to protect electronic communications . . . such as **email and private electronic bulletin boards**.") (emphasis added).

> **b.  Webhosting Services like Media Temple Qualifies are ECS Providers.**

Additionally, website hosting services like Media Temple are undeniably services that provide "to users thereof the ability to send or receive . . . electronic communications."  18 U.S.C. § 2510(15).

---

[14] S*ee also* Josh Lowensohn, *Newbie's Guide to Facebook*, CNET NEWS, *available at* http://news.cnet.com/newbies-guide-to-facebook/ (last visited Apr. 8, 2010) ("Facebook also has its own **e-mail service** . . . similar to what [users] get with Gmail.") (emphasis added).

1   Media Temple is a company that provides website hosting services that
2   provides network environments to host websites, email, business applications, and
3   other rich media content.  Generally speaking, website hosting services allow users to
4   create their own websites and make them available through the internet.   As a website
5   hosting service, Media Temple provides users with "network environments to host
6   websites, email, business applications, and other rich media content."  Media Temple,
7   Inc., home page, http://mediatemple.net/company/about.php (last visited April 9,
8   2010).  More importantly, Media Temple allows its users to set up, up to ***one-***
9   ***thousand e-mail accounts*** using its most basic website hosting service.  Media
10  Temple, Inc., http://mediatemple.net/webhosting/gs/ (last visited April 9, 2010).[15]

11  Even though the Order expressly recognized that e-mail service providers
12  qualify as ECS providers, it held that Media Temple is not an ECS, without any
13  analysis.  As noted above, because Media Temple is a website hosting service that
14  allows users to set up e-mail accounts, it clearly qualifies as an ECS.  Again, this
15  classification is supported by the legislative history of the SCA, as well as the Ninth
16  Circuit in *Konop*.

17  For all of the above reasons, the March 30 Order clearly errs in applying both
18  the law and the facts of these three entities in holding that these entities do not
19  constitute ECS providers.  Crispin therefore respectfully requests that the District
20  Judge modify or set aside the Order consistent with the reasoning herein.

21  **C.    A Civil Subpoena is Insufficient to Override the Protections of the**
22  **SCA.**

23  The March 30 Order states that even if Media Temple, Inc., Facebook, and
24  MySpace, Inc. ***were*** ECS providers, "the production of materials responsive to the
25  subpoena is not prohibited by the SCA." (Ord. Mot. Quash 8.)  However, according to

---

[15] Defendants' subpoenas specifically seek those communications in the e-mail accounts provided by
Media Temple.

the plain and unambiguous language[16] of the SCA, as well as a number of controlling authority supporting it, a civil subpoena is ***insufficient*** to access electronic communications protected by the SCA.

Section 2702 plainly prohibits an electronic communication or remote computing service to the public from knowingly divulging to any person or entity the contents of customers' electronic communications or records pertaining to subscribing customers.  18 U.S.C. § 2702(a) (2000).[17]  Section 2702 also lists unambiguous exceptions that allow an electronic communication or remote computing service to disclose the contents of an electronic communication or subscriber information.  *Id.* at § 2702(b-c).  This section does ***not include an exception for a civil discovery subpoena*** – as distinguished from a ***criminal subpoena,*** as further discussed below.

In *Theofel v. Farey-Jones,* , the court reversed the district court's dismissal of the plaintiffs' claim that the defendants intentionally accessed without authorization the plaintiffs' e-mails in violation of the SCA, where the defendants issued a subpoena to the plaintiffs' internet service provider to obtain the plaintiffs' stored e-mails during the course of civil discovery.[18]  In evaluating the claim, the court emphasized that the SCA protects users whose electronic communications are stored in a communications facility, and reflects Congress's judgment that users have a legitimate interest in the

---

[16] In cases involving statutory construction, the court must presume that Congress expressed its intent or legislative purpose through the ordinary meaning of the words used.  *Am. Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S. Ct. 1534, 71 L. Ed. 2d 748 (1982).  To ascertain legislative intent, the court must look at the statute as a whole, rather than analyzing a single sentence or a single word within a sentence.  *Elm Grove Coal Co. v. Dir., Office of Workers' Comp. Programs,* 480 F.3d 278, 293 (4th Cir. 2007).  When the words of a statute are clear and unambiguous, the court's inquiry ends and the statutory language must be regarded as conclusive. *Am. Tobacco Co.,* 456 U.S. at 68.  Here.the statutory language of the Stored Communications Act contains plain and unambiguous language and a coherent and consistent statutory scheme.

[17] Section 2701 clearly establishes a punishable offense for intentionally accessing without or exceeding authorization and obtaining electronic communications stored at an electronic communication service facility.  *Id.* § 2702(a).

[18] After the internet service provider complied with the subpoena, the defendants read the plaintiffs' e-mails, including many that were privileged, personal, and unrelated to the commercial litigation between the parties.  *Id.* at 1071.

confidentiality of communications stored at such a facility.  *Id.* at 1072-73.  The court

then found that the subpoena was invalid.[19]  Because the invalid "subpoena caused

disclosure of documents that otherwise would have remained private," the court held

that the invalid subpoena invaded "'the specific interests that the [SCA] seeks to

protect.'"  *Id.* at 1073-74 (quoting *J.H. Desnick, M.D., Eye Serv., Ltd. v. ABC,* 44 F.3d

1345, 1352 (7th Cir. 1995)).

Other cases in different jurisdictions have also uniformly held that to be the

case.  *See, e.g., O'Grady v. Superior Court,* 139 Cal. App. 4th 1423 (Cal. Ct. App.

2006) (holding that enforcement of civil subpoenas issued an e-mail service provider

is inconsistent with the plain terms of the SCA)[20]; *Federal Trade Commission v.*

*Netscape Communication Corp.,* FTC. 196 F.R.D. 559, 559, 561 (N.D. Cal. 2000)[21;]

*In re Subpoena Duces Tecum to AOL, LLC*, 550 F. Supp. 2d 606, 610 (E.D. Va. 2008)

(affirmed a motion to quash subpoenas *duces tecum* addressed to AOL, LLC, another

internet service provider).

---

[19] The Court specifically stated that defendants used the subpoenas in such a way that it
"transformed . . . a bona fide state-sanctioned inspection into private snooping."  *Id.* at 1073.
[20] Apple brought a civil action against several unknown defendants for wrongfully publishing online
Apple's secret plans to release a new product.  *Id.* at 76.  Apple issued civil discovery subpoenas to
non-party e-mail service providers, requesting copies of any e-mails with certain keywords from the
published secret plans in an attempt to identify those defendants.  *Id.* at 81.  On appeal, the court
held that disclosure of stored e-mails by those e-mail service providers violates the SCA.  *Id.* at 86.[20]
Emphasizing the substantial burden and expense that would be imposed on internet service providers
if they were required to respond to every civil discovery subpoena issued in a civil lawsuit and how
such a policy may discourage users from using new media, the court refused to create an exception
for civil discovery and found the subpoenas unenforceable under the SCA.  *Id.* at 88-89.
[21] *See also Federal Trade Commission v. Netscape Communication Corp.,* FTC. 196 F.R.D. 559,
559, 561 (N.D. Cal. 2000), in which the court denied the Federal Trade Commission's ("FTC")
motion to compel, where an internet service provider, a non-party in the underlying action, refused
to turn over documents containing subscriber identity information to the FTC.  The court
distinguished *discovery subpoenas* from *trial subpoenas,* based on differences in scope and
operation, and concluded that Congress would have specifically included discovery subpoenas in the
Privacy Act if Congress meant to include this as an exception requiring an internet service provider
to disclose subscriber information to a governmental entity.  *Id.* at 560-61. The court therefore held
that the statutory phrase "trial subpoena" *does not apply to discovery subpoenas in civil cases* and
declined to allow the FTC to use Rule 45 to circumvent the protections built into the Privacy Act that
protect subscriber privacy from governmental entities.  *Id.* at 561.

17

In *In re Subpoena Duces Tecum to AOL, LLC*, during the course of civil litigation, State Farm Fire and Casualty Co. ("State Farm") issued a subpoena to AOL, an ISP, requesting the production of electronic communications of two third-party insurance adjusters (who worked for another insurance company).   The district court affirmed a motion to quash, stating that AOL may not divulge the contents of two third party insurance adjusters' electronic communications to State Farm, because the SCA does not include an exception for *civil discovery subpoenas*.[22]  Citing to the reasoning in *O'Grady,* the court then stated that because the SCA does not authorize disclosure pursuant to a civil subpoena, the statute prohibits AOL from producing those e-mails.  The court additionally cited to the above cases, which distinguished a *discovery subpoena in a civil case* from a *trial subpoena,* which would otherwise circumvent the clear intent of the SCA.[23]

Therefore, applying the clear and unambiguous language of § 2702, as well as the above authority supporting it, the March 30 Order clearly erred when it ordered those entities to compel production of Crispin's electronic communications pursuant to those subpoenas.  Because the enumerated exceptions under Section 2702(b) of the SCA do not make any reference to civil subpoenas, civil litigation, or the civil discovery process, the subpoenas may not be enforced consistently with the plain terms of the SCA.  *In re Subpoena Duces Tecum to AOL, LLC*, 550 F. Supp. 2d at 611.

---

[22] The Court noted that State Farm's subpoena to the insurance adjusters' internet service provider resembles the subpoena at issue in *Theofel,* because it seeks to obtain copies of the two adjusters' e-mails in the course of discovery for a civil lawsuit.  In line with the court's reasoning in *Theofel,* the *AOL, LLC* Court found that the SCA protects the third party's stored e-mails, because they have a legitimate interest in the confidentiality of their personal e-mails being stored electronically by AOL.

[23] Additionally, the exceptions under Section 2703 of the SCA do not apply.  Those exceptions pertain exclusively to *criminal investigations* – not civil matters such as this.  Additionally, because the Defendants are private parties and this is a civil suit, none of the government exceptions apply.

### D.   The Electronic Communications Sought are Unequivocally in "Electronic Storage"

Finally, the March 30 Order found that the electronic communications sought by the Defendants were "not in electronic storage."  (As previously addressed, the SCA prohibits an ECS from "knowingly divulg[ing] to any person or entity the contents of a communication *while in electronic storage* by that service," unless, among other exceptions not relevant to this appeal, that person or entity is "an addressee or intended recipient of such communication." *Id.* § 2702(a)(1), (b)(1), (b)(3).  (Emphasis added.))

This finding erroneously relied on Defendants' misstatements of the definition of "electronic storage" – Defendants incorrectly argued that "webmail" is not electronic storage – and was made without affording Crispin the opportunity to "provide contrary information," as it issued on March 30 (prior to the pending hearing date set for April 20, and before Crispin's deadline to submit a Supplemental Memorandum as allowed under C.D. Cal. R. 37-2.3).

There can be no real dispute that the SCA reflects Congress's judgment that "users have a legitimate interest in the confidentiality of communications in electronic storage at a communications facility," and "protects users whose electronic communications are in electronic storage with an . . . electronic communications facility."  *Theofel*, 359 F.3d at 1072-73.  It was this within framework that Congress drafted the SCA, and defined technologically evolving terms such as "electronic storage."

### 1.  Definition of "Electronic Storage"

The SCA defines "electronic storage" as "(A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (B) any storage of such communication by an [ECS] for purposes of backup protection of such communication."  18 U.S.C. § 2510 (17).  Congress

19

expressly intended this definition to encompass "storage within the random access memory of a computer *as well as storage in any other form* including storage of magnetic tapes, disks or other media."  S. Rep. No. 99-541, at 16 (1986) (emphasis added).

Applying this definition to the modern landscape of e-mail and messaging, the Ninth Circuit and other courts have held that subsection (A) encompasses "e-mail messages stored on an [Internet service provider]'s server pending delivery to the recipient."  *Theofel*, 359 F.3d at 1075.  Thus, messages are in "temporary, intermediate storage" when they have not been delivered to their intended recipient.  *Id.*  However, the inquiry into "electronic storage" does not end there.  Under the Ninth Circuit, messages remaining on an ECS *after delivery* fit squarely within subsection (B) if they are stored "for purposes of backup protection."  *Theofel*, 359 F.3d at 1075.

In *Theofel*, the court rejects outright the view that "backup protection" includes only *temporary* backup storage pending delivery, because the plain language of subsection (B) does not distinguish between "intermediate" and "post-transmission" storage.  *Id.*  *Theofel* involved officers of the company, plaintiffs, embroiled in commercial litigation with defendant.  The defendant's attorney served a subpoena on the plaintiffs' Internet service provider, NetGate, requesting copies of all e-mails sent to or from anyone at the company, to which NetGate complied.  The district court denied the plaintiff's claim under the SCA.  Upon review, the Ninth Circuit reversed, finding that all of those e-mails, *both unopened and opened*, were subject to the SCA.

The *Theofel* opinion highlights that an "obvious purpose for storing a message on an [Internet service provider]'s server after delivery is to provide a second copy of the message in the event that the user needs to download it again—if, for example, the message is accidentally erased from the user's own computer."  *Id.*  Thus, the Act does not require that the "backup protection" be for the benefit of the service provider; rather, "backup protection" can benefit the user.  *Id.*  The court then stated

20

unequivocally that, "because plaintiff's e-mail messages were in electronic storage, regardless of whether they had been previously delivered, the district court's decision cannot be affirmed…"  *Id.* at 1077.[24]

In *Quon v. Arch Wireless Operating Co., Inc.*, the Ninth Circuit reaffirmed *Theofel's holding,* stating that "a provider of e-mail services, undisputedly an ECS, stored e-mails on its servers for **backup protection**."  *Quon*, 529 F.3d at 902 (citing *Theofel*, 359 F.3d at 1075).  The Ninth Circuit then further interpreted the definitions of "electronic storage," this time in the context of text messages.

Drawing analogies to *Theofel*, the court found that the service provider at issue in the *Quon* case – a pager service that enabled users to send text messages to one another – also kept those electronic communications in "electronic storage":

> The service provided by NetGate (from *Theofel*) is closely analogous to Arch Wireless's storage of Appellants' messages.  Much like Arch Wireless, NetGate served as a conduit for the transmission of electronic communications from one user to another, and stored those communications "as a 'backup' for the user."  *Id.*  Although it is not clear for whom Arch Wireless "archived" the text messages-- presumably for the user or Arch Wireless itself--it is clear that the messages were archived for "backup protection," just as they were in *Theofel*.

*Quon,* F29 F.3d at 902.  The court emphasized that this reading of the definition of "backup protection" is supported both by the "plain language of the SCA, including its common-sense definitions," as well as its legislative history.  *Id.* at 900-01.

---

[24] Further, the Ninth Circuit expressly rejected cases holding that the SCA only protects e-mails pending delivery.  In response to *Fraser* v. *Nationwide Mut. Ins. Co.*, 135 F. Supp. 2d 623, 635-36 (E.D. Pa. 2001), the Court held that "[w]e reject the view (that holding that "backup protection" includes only temporary backup storage pending delivery, and not any form of "post-transmission storage) as contrary to the plain language of the [SCA]."  *See also, e.g., In re Doubleclick, Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 511-12 (S.D.N.Y. 2001); *Fraser* v. *Nationwide Mut. Ins. Co.*, 135 F. Supp. 2d 623, 635-36 (E.D. Pa. 2001); *cf. Steve Jackson Games, Inc.* v. *U.S. Secret Serv.*, 36 F.3d 457, 461-62 (5th Cir. 1994) (messages stored on a BBS pending delivery).

21

Therefore, it is **this interpretation** of "electronic storage," as interpreted in the "backup protection" context of 18 U.S.C. § 2510 (17)(B), that applies.


### 2. Materials Sought are Undeniably "Electronic Storage."

In light of these rulings, messages sent and received by users of Facebook, MySpace, and Media Temple are unequivocally kept in "electronic storage."

a. Electronic Communications to Media Temple

First, the Magistrate Judge finds that Media Temple does not have electronic communications in "electronic storage."  This is clearly wrong, as Media Temple is an electronic service provider that allows users to send and receive e-mails in **exactly the same way** that the service provider, NetGate, did in *Theofel.  See also* Company Profile: Media Temple, Inc.com, *available at* http://www.inc.com/inc5000/2008/company-profile.html?id=200813710 (last visited Apr. 8, 2010).  Media Temple is exactly the typical e-mail service provider to which *Quon* and *Theofel* speak to.  The March 30 Order did not acknowledge the fact that e-mail services were provided by Media Temple (nor did the Order acknowledge the same for Facebook and MySpace).[25]  Therefore, these electronic communications sought by the subpoena to Media Temple are undeniably protected by the SCA.


b. Electronic Communications sought from Facebook and MySpace

Likewise, the March 30 Order that Facebook and MySpace electronic communications are not in "electronic storage" is also clearly in error.  First, the Order

PLAINTIFF'S MOTION FOR REVIEW OF MAGISTRATE JUDGE'S ORDER

misreads Crispin's description of Facebook and MySpace when he finds that all communications are merely achieved through "postings."  Second, the Order improperly relies on Defendants' "Wikipedia" definitions of Facebook and MySpace messaging services to argue that these communications are not held in "backup storage."  In any event, all of these electronic communications sought by the subpoenas to Facebook and MySpace are undeniably in "electronic storage."

As briefly described above, Facebook and MySpace are social networking sites that work along similar lines; both provide each user a "profile page" that allows users to personalize and share and receive electronic communications.  On Facebook, the distinguishing feature is the "Wall," on which other users (and the user him/herself) can post messages.[26]  Similarly, MySpace also allows users to have customized Profile Pages, which allow users to post "Comments" on each others' "Bulletins."[27]

In addition to Facebook's "wall" feature, Facebook also has its own e-mail service, which allows users to send private messages to other Facebook users, "similar to what you get with Gmail."  Josh Lowensohn, *Newbie's Guide to Facebook*, CNET NEWS, *available at* http://news.cnet.com/newbies-guide-to-facebook/ (last visited Apr. 8, 2010).[28]  MySpace similarly has its own e-mail service, which allows users to send and receive private messages in a conventional e-mail format.[29]

---

[25] The Magistrate Judge's distinctions on, i.e., "webmail" versus "application-based e-mail" therefore make no sense in this context, as web-based e-mail service providers still allow users to view messages indefinitely for backup purposes, and therefore are kept in electronic storage.

[26] *See* Facebook Help Center, *Wall: How to Use the Wall Feature and Wall Privacy*, http://www.facebook.com/help/?page=820 (last visited Apr. 8, 2010) (click "What can I do on the Wall?") ( "The Wall is the center of [a user's] profile for adding things, like photos, videos, notes and other application content.  The Publisher at the top of your wall allows [users] to update [their] status and share content through many different kinds of Wall posts.").

[27] *See* MySpace Quick Tour, MySpace, *available at* http://www.myspace.com/index.cfm?fuseaction=userTour.home (last visited Apr. 8, 2010) (click "New to MySpace?").

[28] As with Internet-based e-mail providers, Facebook users can send private messages to other users by selecting the "send FRIEND a message" link on another user's profile page.  This will open up the message composition page, where users can write messages, add attachments, and send private communications in much the same manner as Internet-based e-mail.  *Id.*  Messages sent and received

Because these e-mail communications through Facebook and MySpace are stored the same way as e-mails in more conventional platforms, all of the electronic communications passed through the e-mail functions of Facebook and MySpace undeniably are held in "electronic storage."  These communications are therefore protected under the SCA.

With respect to the "wall postings" on Facebook and profile page "comments" on Myspace, these communications are also held in "electronic storage."  As *Theofel* and *Quon* addressed in varying contexts, storage on servers, that are nevertheless accessible and viewable to individual users, nevertheless can qualify as communications held for "backup protection."[30]

Furthermore, these "posts" and "comments" are electronic communications similar to e-mails because they essentially allow users to "leave a note on [another user's] profile page."[31]  In fact, in *Konop v. Hawaiian Airlines, Inc.,* 302 F.3d 868 (9th Cir. Cal. 2002), the Ninth Circuit even found that messages posted on a online bulletin

---

are accessible through Facebook's "Message" center, and are accessible only by the sender and recipient, just like e-mail.  In fact, Facebook assures its users that the "contents of [a user's] Inbox are only visible to [that user] . . . The only users who can view messages . . . are the other recipients and senders of those messages."  Facebook Help Center, *Messages and Inbox:  Privacy*, http://www.facebook.com/help/?page=940 (last visited Apr. 8, 2010).

[29] Julia Layton and Patrick Brothers, *How MySpace Works: Using MySpace, MySpace Interface, Introduction*, HOW STUFF WORKS, *available at* http://computer.howstuffworks.com/internet/social-networking/networks/myspace.htm (last visited Apr. 8, 2010). "You can request to add anyone to your Friend Space, and if your invitation is accepted, you can send that person e-mail, instant messages, links to a band you discovered in MySpace Music and anything else you might share with your friends."  Julia Layton and Patrick Brothers, *How MySpace Works: Using MySpace, MySpace Interface, Introduction*, HOW STUFF WORKS, *available at* http://computer.howstuffworks.com/internet/social-networking/networks/myspace.htm (last visited Apr. 8, 2010)

[30] As noted above, the Ninth Circuit has interpreted "backup protection" to include *temporary, intermediate and post-transmission* storage of electronic communications.  *Theofel*, 359 F.3d at 1075.

[31] Josh Lowensohn, *Newbie's Guide to Facebook*, CNET NEWS, *available at* http://news.cnet.com/newbies-guide-to-facebook/ (last visited Apr. 8, 2010).  Much like retrieving an e-mail, in order to access these messages, a user must first log on to his or her profile page.  *See MySpace, Inc. v. Wallace*, 498 F. Supp. 2d 1293, 1297 (C.D. Cal 2007).

board, on a pilot's secure website space provided to him by his employee airline company, even constituted electronic communications that was protected by the SCA:

> The legislative history of the ECPA suggests that Congress wanted to protect electronic communications that are configured to be private, ***such as email and private electronic bulletin boards***. *See* S. Rep. No. 99-541, at 35-36 ("This provision [the SCA] addresses the growing problem of unauthorized persons deliberately gaining access to … electronic or wire communications that are not intended to be available to the public."); H.R. Rep. No. 99-647 at 41, 62-63 (1986) (describing the Committee's understanding that the configuration of the electronic communications system would determine whether or not an electronic communication was readily accessible to the public.).).

*Konop*, 302 F.3d at 875 (emphasis added).

While the court acknowledge that "until Congress brings the laws in line with modern technology, protection of the Internet and websites such as (the pilot) Konop's will remain a confusing and uncertain area of the law," nevertheless the website contents were protected under the SCA.  *Konop*, 302 F.3d at 875.[32]

In conclusion, the electronic communications at issue here are fully protectable by the SCA.  All of the electronic communications sought by the subpoenas here are therefore compelled in clear violation of the SCA.   Plaintiff respectfully requests that the March 30, 2010 Order should be modified or set aside.

---

[32] The *Konop* Court then went on to state:

> The legislative history of the ECPA suggests that Congress wanted to protect electronic communications that are configured to be private, ***such as email and private electronic bulletin boards***. *See* S. Rep. No. 99-541, at 35-36 ("This provision [the SCA] addresses the growing problem of unauthorized persons deliberately gaining access to … electronic or wire communications that are not intended to be available to the public."); H.R. Rep. No. 99-647 at 41, 62-63 (1986) (describing the Committee's understanding that the configuration of the electronic communications system would determine whether or not an electronic communication was readily accessible to the public.).

*Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 875 (9th Cir. Cal. 2002) (emphasis added).

V.     **CONCLUSION**

For the foregoing reasons, Crispin respectfully requests that the Court reverse the March 30 Order as follows:

     1.    Facebook and MySpace, Inc. need not comply with the subpoena's Category Nos. 2, 3, and 4; and

     2.    Media Temple, Inc. need not comply with the subpoena's Request Nos. 1 through 5.

Dated:  April 9, 2010                  Respectfully Submitted,

                                    DONIGER/BURROUGHS APC

                      By:   /S/ Regina Y. Yeh
                                Regina Y. Yeh, Esq.
                                Attorneys for Plaintiff

PLAINTIFF'S MOTION FOR REVIEW OF MAGISTRATE JUDGE'S ORDER

## <u>DECLARATION OF REGINA Y. YEH, ESQ.</u>

I, Regina Y. Yeh, am above eighteen years of age, and an attorney at the Doniger/ Burroughs APC, counsel for Plaintiff Buckley H. Crispin.  I have personal knowledge of the matters set forth herein, and if called as a witness, could and would competently testify hereto.

1. I have personally attached as Exhibits 1 through 4 hereto true and correct copies of the notice of subpoenas *duces tecum* to Black Market Art Company, Facebook, Media Temple, Inc., and MySpace, Inc.  These four subpoenas were served on our office on February 10, 2010.

2. On or about Thursday, April 8, 2010, my office met and conferred with Defendants' counsel over this motion.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed April 9, 2010 at Culver City, California


<u>/s/ Regina Y. Yeh</u>
Regina Y. Yeh, Esq.

PLAINTIFF'S MOTION FOR REVIEW OF MAGISTRATE JUDGE'S ORDER